1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

14

15

16

17

18

19

20

21

| | |
|---|---|
| MARIBEL TAVARES, individually and on behalf of other members of the general public similarly situated and on behalf of the aggrieved employees pursuant to the California Private Attorneys General Act,<br><br>Plaintiff,<br><br>v.<br><br>CARGILL, INCORPORATED, an unknown business entity; CARGILL MEAT SOLUTION CORP., an unknown business entity; and DOES 1 to 100, inclusive,<br><br>Defendants. | No. 1:18-cv-00792-ADA-SKO<br><br>FINDINGS AND RECOMMENDATIONS TO DENY REQUESTS TO SEAL AND PLAINTIFF'S MOTION FOR CLASS CERTIFICATION<br><br>(Docs. 72, 73, 79)<br><br>**14-DAY DEADLINE** |

22

23

24

25

26

27

28

        Before the Court is Plaintiff Maribel Tavares ("Plaintiff")'s motion for class certification

(the "Class Certification Motion"), filed on May 1, 2023.[1]  (Doc. 72.)  Defendants Cargill,

Incorporated ("Cargill, Inc.") and Cargill Meat Solution Corp. ("Cargill Meat") (collectively,

"Defendants") filed an opposition on June 6, 2023.  (Doc. 77.)  Plaintiff filed a reply on July 10,

2023.  (Doc. 80.)  Plaintiff also filed a request to seal documents in support of the Class Certification

---

[1] The motion was referred to the undersigned magistrate judge for findings and recommendations pursuant to 28 U.S.C. § 636(b).  (*See* Doc. 40 at 3.)

1  Motion (Doc. 72), in which Defendants joined (Doc. 78).[2]  Defendants filed a second request to

2  seal (Doc. 79); Plaintiff has not filed any opposition (*see* Docket).  The undersigned deemed

3  Plaintiff's Class Certification Motion suitable for decision without oral argument pursuant to Local

4  Rule 230(g).  The hearing set for August 2, 2023, was therefore vacated.  (Doc. 83.)

5       For the reasons set forth below, the undersigned will recommend that: (1) the parties'

6  requests to seal (Docs. 73, 79) be denied as moot, and (2) Plaintiff's Class Certification Motion

7  (Doc. 72) be denied based on the class as defined and proposed to be represented by Plaintiff

8  Maribel Tavares in the motion.

9                          **I.      BACKGROUND**

10 **A.   Procedural Background**

11      On April 19, 2018, Plaintiff filed this putative class action against Defendants in Fresno

12 County Superior Court.  (*See* Doc. 1-1 at 1–33.)  Defendants removed the action to federal court,

13 invoking jurisdiction under the Class Action Fairness Act.  (Doc. 1.)  Following the Court's ruling

14 granting Defendants' motions to dismiss in part (Doc. 32), Plaintiff filed a second amended

15 complaint.  (*See* Doc. 33.)

16      On May 1, 2023, Plaintiff filed the Class Certification Motion seeking to represent a class

17 of employees affected by Defendants' allegedly improper policies and practices.  (Doc. 72.)

18 Plaintiff seeks certification on seven of the claims named in the second amended complaint:

19 (1) failure to pay overtime wages; (2) failure to pay minimum wages; (3) failure to provide

20 compliant meal periods or meal period premium payments in lieu of compliant meal periods;

21 (4) failure to timely pay earned wages upon termination of employment; (5) failure to reimburse

22 necessary business expenses; (6) failure to provide compliant itemized wage statements; and

23 (7) unfair competition in violation of California's Business & Professions Code.  (*Id*. at 2–3, 12.)[3]

24      Plaintiff seeks to certify the following class under Fed. R. Civ. P. 23:

25      All current and former hourly-paid or non-exempt employees who worked for any
       of the Defendants at their Fresno, California facility and at any time during the
26     period from four years preceding the filing of this Complaint to final judgment.

27 _____
   [2] Plaintiff filed a notice of errata as to this request to seal clarifying details of the sealing request.  (*See* Doc. 81.)
   [3] Plaintiff indicates she is not seeking class certification on at least one of the claims raised in the operative
28 complaint.  (*See* Doc. 72 at 12 n.2.)

                                    2

1  (Doc. 72 at 2, 11.)[4]  Defendants oppose the Class Certification Motion, contending that Plaintiff

2  has not demonstrated commonality under Rule 23(a) or predominance under Rule 23(b)(3).  (Doc.

3  77.)

4  **B.     Factual Background**

5        Defendants manufacture, process, and distribute meat for global consumption.  (Doc. 72

6  ¶ 11.)  Cargill, Inc. is the parent company of Cargill Meat and provides several human resources

7  functions to Cargill Meat, including assisting with training and providing copies of the company's

8  handbook.  (Doc. 72-1, Declaration of Marissa A. Mayhood ("Mayhood Decl."), Ex. 2 & Doc. 77-

9  2, Declaration of Brett Greving ("Greving Decl."), Ex. B, Deposition of Carla Bettencourt

10  ("Bettencourt  Dep.")  at  69:21–70:24;  76:3–77:19.)    Cargill  Meat  operates  five  facilities  in

11  California, including one in Fresno, where non-exempt employees worked during the relevant time

12  period.  (Mayhood Decl. at 7.)  Plaintiff was employed by Cargill Meat from approximately April

13  2013 to February 2017 as a "production employee"[5] at the Fresno facility.  (Doc. 72-4, Declaration

14  of Plaintiff ("Plaintiff Decl.") at ¶ 2; Doc. 77-2, Greving Decl., Ex. A, Deposition of Plaintiff

15  ("Plaintiff Dep.") at 12:22–14:1.)   During her time at Cargill Meat, she held three different

16  positions: packer, machine operator, and forklift driver.  (Plaintiff Dep. at 45:13–21.)

17        Plaintiff's proposed class is comprised of employees who worked in the various processing

18  departments at Defendants' Fresno facility.  (Doc. 72 at 11; *see also* Teeter Dep. at 38:24–39:6.)

19  Approximately 4,000 non-exempt, hourly employees worked at the Fresno facility during the

20  relevant time period, the vast majority of which were production employees.  (Bettencourt Dep. at

21  19:18–20:1; 22:2–4.)

22  ///

23  ///

24  ///

25

26  ---
[4] This definition of the class, set forth in Plaintiff's Class Certification Motion, is intended to supersede the definition contained in the second amended complaint.  (*See* Doc. 72 at 2, 11–12.)

27  [5] One of Defendants' corporate designee(s) under Fed. R. Civ. P. 30(b)(6), Tanya Teeter, described a production employee as someone who worked in the processing department, as opposed to administration, and noted most

28  production employees were non-exempt, hourly employees.  (Mayhood Decl., Ex. 4 & Doc. 77-2, Greving Decl., Ex. C, Deposition of Tanya Teeter ("Teeter Dep.") at 97:4–13; 110:14–19.)

## II.      DISCUSSION

**A.      The Parties' Requests to Seal (Docs. 73, 79)**

Plaintiff filed a request to seal documents previously designated as confidential by Defendants pursuant to the parties' stipulated protective order in support of the Class Certification Motion. (Doc. 72.) Defendants join in Plaintiff's request to seal. (Doc. 78.) Defendants also filed a second request to seal (Doc. 79), to which Plaintiff filed no opposition. In their requests to seal, the parties contend that these documents are covered by their stipulated protective order (*see* Doc. 67) and they contain confidential, proprietary, and commercially sensitive information that could be harmful if publicly disclosed. The Court has not relied on any of the documents the parties have requested to seal, nor has the Court cited any of the redacted portions as part of this order. *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, Nos. 2:16-cv-158 WBS AC, 2:16-cv-1211 WBS AC, 2019 WL 358517, at *7 (E.D. Cal. Jan. 29, 2019). Accordingly, the undersigned shall recommend denying the parties' requests to seal documents as moot. *Id.*

**B.      Defendants' Request for Judicial Notice (Doc. 77-1)**

Defendants ask that the Court take judicial notice of the generally known fact that the Covid-19 pandemic started no earlier than December 2019. (Doc. 77-1.) Defendants attach this Court's General Order No. 611 and a proclamation from the President of the United States which refer to the President's declaration of a national emergency in response to the Covid-19 pandemic. (*Id*. at 77-1 at 4–11.)

Federal Rule of Evidence 201 allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b). The Court may take judicial notice of "matters of public record," *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), and "must take judicial notice if a party requests it and the court is supplied with the necessary information," Fed. R. Civ. P. 201(c)(2). Because the two documents provided by Defendants are matters of public record and are readily verifiable, Defendants' request for judicial notice is GRANTED. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts

may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'").

**C.    Defendants' Evidentiary Objections (Doc. 77-4)**

Defendants have filed numerous objections under Federal Rule of Evidence 901 to the evidence submitted by Plaintiff in support of the Class Certification Motion.  (Doc. 77-4.)  "In determining whether class certification is appropriate under Rule 23, courts 'may consider all material evidence submitted by the parties . . . and need not address the ultimate admissibility of evidence proffered by the parties.'"  *Blair v. CBE Grp., Inc.*, 309 F.R.D. 621, 627 (S.D. Cal. 2015) (citations omitted).  In particular,

> Since a motion to certify class is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974) (The class certification procedure "is not accompanied by the traditional rules and procedures applicable to civil trials.").  At the certification stage, "the court makes no findings of fact or announces no ultimate conclusions on Plaintiffs' claims."  *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D. Cal. 2011) (*quoting Mazzo v. Am. Honda Motor Co*., 254 F.R.D. 610, 616 (C.D. Cal. 2008)).  Therefore, the Court may consider inadmissible evidence at the class certification stage. *Keilholtz v. Lennox Hearth Prods., Inc*., 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010).  "The court need not address the ultimate admissibility of the parties' proffered exhibits, documents and testimony at this stage, and may consider them where necessary for resolution of the [Motion for Class Certification]."  *Alonzo*, 275 F.R.D. at 519.

*Gonzalez v. Millard Mall Servs., Inc*., 281 F.R.D. 455, 459 (S.D. Cal. 2012).

In light of the "lenient evidentiary standard" that applies at this stage of the proceedings, the undersigned recommends overruling Defendants' evidentiary objections for purposes of the Class Certification Motion.  *See Blair*, 309 F.R.D. at 627.  To the extent that any evidence proffered by the parties lacks foundation, the Court will not consider such material.  *Id*.; *see also Burch v. Regents of Univ. of Cal*., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("Objections on any of these grounds are simply superfluous in this context.").

**D.    Motion for Class Certification (Doc. 72)**

Plaintiff moves to certify one class: "All current and former hourly-paid or non-exempt employees who worked for any of the Defendants at their Fresno, California facility and at any time during the period from four years preceding the filing of this Complaint to final judgment." (Doc. 72 at 2, 11.)  Plaintiff contends she meets the four requirements for class certification under

Rule 23(a). (*Id.* at 13–17.) She further asserts that class certification is appropriate under Rule 23(b)(3) (*id.* at 17–30), which permits maintenance of a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Defendants oppose class certification, contending Plaintiff has demonstrated neither commonality under Rule 23(a) nor predominance under Rule 23(b)(3). (Doc. 77.)

For the reasons explained below, the Court finds that Plaintiff has failed to demonstrate commonality and predominance as to the proposed class.[6] Accordingly, the undersigned will recommend that the Class Certification Motion be denied.

     1.   <u>Legal Standard for Class Certification</u>

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 320 (C.D. Cal. 2015). "Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *In re Seagate Technology LLC*, 326 F.R.D. 223, 239 (N.D. Cal. 2018) (quoting *Mazza*, 666 F.3d at 588). The Court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable [numerosity requirement]; (2) there are questions of law or fact common to the class [commonality requirement]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality requirement]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy requirement]." Fed. R. Civ. P. 23(a). The purpose of these requirements is to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks omitted).

---

[6] Having found that the commonality and predominance inquiries are dispositive in this matter, the undersigned need not address any other elements of the Rule 23 analysis. *See Blair*, 309 F.R.D. at 627–28 n.4; *Hernandez v. Christensen Bros. Gen. Eng'g, Inc.*, No. 5:22-cv-00836-AB-SP, 2023 WL 3069760, at *15 (C.D. Cal. Apr. 24, 2023).

1    In addition to these four requirements, the Court must find that at least one of the following

2    three conditions is satisfied: (1) the prosecution of separate actions would create a risk of: (a)

3    inconsistent or varying adjudications, or (b) individual adjudications dispositive of the interests of

4    other members not a party to those adjudications; (2) the party opposing the class has acted or

5    refused to act on grounds generally applicable to the class; or (3) questions of law or fact common

6    to the members of the class predominate over any questions affecting only individual members,

7    and a class action is superior to other available methods for the fair and efficient adjudication of

8    the controversy.  Fed. R. Civ. P. 23(b).

9    "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification

10    must affirmatively demonstrate . . . compliance with the Rule[.]"  *Dukes*, 564 U.S. at 350; *see also*

11    *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) ("the party seeking

12    certification . . . bears the burden of showing she has met each of the four requirements of Rule

13    23(a) and at least one of the requirements of Rule 23(b)").  Rule 23 further provides that, "[w]hen

14    appropriate, an action may be brought or maintained as a class action with respect to particular

15    issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated

16    as a class under this rule," Fed. R. Civ. P. 23(c)(5).  "This means that each subclass must

17    independently meet the requirements of Rule 23 for the maintenance of a class action."  *Betts v.*

18    *Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

19    A trial court has broad discretion to grant or deny a motion for class certification.  *See*

20    *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).  The Court's class

21    certification analysis "may 'entail some overlap with the merits of the plaintiff's underlying

22    claim.'"  *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 465–66 (2013) (quoting

23    *Dukes*, 564 U.S. at 351).  "Merits questions may be considered to the extent—but only to the

24    extent—that they are relevant to determining whether the Rule 23 prerequisites for class

25    certification are satisfied."  *Id.* at 466.

26    ///

27    ///

28    ///

2.   Plaintiff Fails to Demonstrate Commonality Under Rule 23(a) and Predominance Under Rule 23(b)(3)

*a.   **Legal Standards for Commonality and Predominance***

Although commonality and predominance are distinct inquiries, they often involve overlapping considerations, and courts frequently address the two requirements together. *See, e.g.*, *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (noting that "there is substantial overlap between" the tests for commonality and predominance); *Schmidtberger v. W. Ref. Retail, LLC*, No. 2:19-cv-04300-VAP (SKx), 2021 WL 5024714, at *11–12 (C.D. Cal. Sept. 28, 2021) (discussing commonality and predominance together); *Christensen v. Carter's Retail, Inc.*, No. 8:20-cv-00776 JLS (KESx), 2021 WL 4932244, at *6 (C.D. Cal. Oct. 21, 2021) (same).

The requirement of commonality demands that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50. The plaintiff must demonstrate "that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.'" *Jimenez v. Allstate Inc. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Dukes*, 564 U.S. at 350). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (2011) (citation omitted).

Similarly, predominance requires "that questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement, however, is "far more demanding" than the commonality requirement. *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 981 (C.D. Cal. 2015) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Windsor*, 521 U.S. at

623.

The Court will address each of Plaintiff's specific claims under the standards articulated above, and finds that none of her claims establish commonality under Rule 23(a) and predominance under Rule 23(b)(3).

### b.    Commonality and Predominance as to Plaintiff's Off-the-Clock Claims

Under California law, "[e]very employer shall pay to each employee . . . not less than the applicable minimum wage for all hours worked in the payroll period."  Cal. Code Regs. tit. 8, § 11070(4)(b) (Wage Order 7-2001).  "In California, 'hours worked means the time during which an employee is subject to the control of the employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.'"  *Zayers v. Kiewit Infrastructure West Co*., No. 16–CV–06405 PSG (PJW), 2017 WL 4990460, at *5 (C.D. Cal. Oct. 26, 2017) (citations omitted); *see also Troester v. Starbucks Corp*., 5 Cal. 5th 829, 848 (2018) (concluding that "[t]he relevant statutes and wage order do not allow employers to require employees to routinely work minutes off the clock without compensation," but leaving open the question of "whether there are wage claims involving employee activities that are so irregular or brief in duration that employers may not reasonably be required to compensate employees for the time spent on them.").  Here, Plaintiff's off-the-clock claims require, *inter alia*, a showing that "[c]lass members performed work for which they did not receive compensation."  *Howard v. CVS Caremark Corp.*, No. CV 13-04748 SJO (PJWx), 2014 WL 11497793, at *10 (C.D. Cal. Dec. 19, 2014), *aff'd*, 628 F. App'x 537 (9th Cir. 2016) (citations omitted).

Plaintiff alleges that she and other employees "were regularly required to perform unpaid work tasks ***prior to*** clocking in for a shift, ***after*** clocking out for meal periods, and ***after*** clocking out at the end of each shift."  (Doc. 72 at 17 (emphasis in original).)  Plaintiff sets forth several theories of liability in support of the argument that Defendants had uniform policies that violated the law by requiring off-the-clock work and thus, provided a common question eminently suited for class treatment.  (*Id*. at 17–18 (citing *Brinker Rest. Grp. v. Super. Ct.*, 53 Cal. 4th 1004, 1033 (2012)).  Specifically, Plaintiff points to Defendants' policies and practices as to donning and

doffing standard PPE, pre-shift Covid health checks, cleaning lockers, and reading the bulletin boards in the breakroom.  (Doc. 72 at 18–22.)

Where plaintiff seeks class certification on the theory that the defendant employed a uniform unlawful policy or practice—as is the case here—the Court must consider whether the plaintiff provided substantial evidence "that the entire class was subject to the same allegedly [unlawful] practice."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011); *see also Brown v. Wal-Mart Stores, Inc.*, No. 5:09-CV-03339 EJD, 2012 WL 3672957, at *4 (N.D. Cal. Aug. 24, 2012), *aff'd*, 651 F. App'x 672 (9th Cir. 2016) ("Plaintiff needs to offer 'substantial evidence' of the company-wide policy or practice that violated [labor] regulations.").  "[W]here no substantial evidence points to a uniform, companywide policy, and proof of off-the-clock liability would have . . . to continue in an employee-by-employee fashion, class certification is inappropriate."  *Howard*, 2014 WL 11497793, at *10 (quoting *Brinker*, 53 Cal. 4th at 1051) (internal quotation marks omitted).

### i.      Commonality

#### (a)      Defendants' Off-the-Clock Policy Is Facially Neutral

Plaintiff contends that Defendants maintain uniform policies that require its employees to don and doff standard PPE, undergo Covid health checks, clean lockers, and read bulletin boards prior to clocking in, after clocking out for meal periods, or after clocking out at the end of a shift. (Doc. 72 at 17–22.)  The relevant inquiry, however, is not whether employees had to complete these tasks, as that is not the unlawful policy of which Plaintiff complains.  *Christensen*, 2021 WL 4932244, at *7.  Rather, the pertinent question is whether Defendants had uniform policies across its Fresno facility of conducting these tasks off-the-clock.  *See id.*  Here, the Court finds there is no substantial evidence to support Plaintiff's contention that Defendants have uniform policies of off-the-clock donning and doffing standard PPE, Covid health checks, cleaning lockers, and reading bulletin boards.

To the contrary, the evidence indicates that Defendants' policies regarding off-the-clock work were facially neutral.  According to one of Defendants' corporate designees, Cargill Meat maintains timekeeping procedures for employees at its Fresno facility.  (Teeter Dep. at 73:5–9.)

1    Employees clock in at the start of their day, pick up or sign out any equipment that would not be at

2    their station, and then go to their designated area or workstation on the production floor. (*Id*. at

3    73:12–75:4; 76:8–15; 77:7–78:17.)   At the end of the shift, employees complete tasks such as

4    moving to designated wash areas if they need to wash off things like their boots, returning their

5    equipment, putting their frocks[7] in the bins to be laundered, or tossing out disposables such as

6    hairnets or beard nets, and then they clock out. (*Id*. at 78:22–79:18.)   Though there are differences

7    as to the end-of-shift procedures for the various employees, these procedures were still completed

8    before the employees clocked out for the day. (*Id*. at 79:18–21.)

9         Cargill Meat also provides all the standard and nonstandard personal protective equipment

10   ("PPE") necessary for employees to do their job. (Teeter Dep. at 108:19–109:19.)   Cargill Meat

11   classifies standard PPE as hard hats, safety glasses, earplugs, radios (if an employee is assigned a

12   radio), and footwear. (*Id*. at 70:15–20.)   Employees have the option to take their standard PPE

13   home or keep it in their locker if they have a locker. (*Id*. at 59:2–11, 72:3–10.)   Nonstandard PPE

14   is classified is equipment required to keep employees safe at their jobs such as mesh aprons, cut-

15   resistant gloves, and plastic sleeves. (*Id*. at 70:21–71:71:6.)   Nonstandard PPE was typically kept

16   at each employee's workstation on the production floor, or employees could pick it up in after

17   clocking in, and cannot not be taken home. (*Id*. at 72:11–22, 109:16–19.)

18        In light of the foregoing evidence, the Court finds that Defendants had a facially valid policy

19   for donning and doffing standard PPE, and the Court cannot conclude that the evidence corresponds

20   to a legal violation on a class-wide basis.   "When an employer has a facially valid policy, there is

21   a risk that substantial individualized inquiries will be necessary to determine liability." *Hubbs v.*

22   *Big Lots Stores, Inc.*, No. LA CV15-01601 JAK (ASx), 2017 WL 2304754, at *12 (C.D. Cal. May

23   23, 2017*); see, e.g., Rojas-Cifuentes v. ACX Pac. Nw. Inc.*, No. 2:14-cv-00697-JAM-CKD, 2018

24   WL 2264264, at *8 (E.D. Cal. May 17, 2018) (finding the plaintiff's donning/doffing theory to be

25   "highly specific," and thus, unable to "be resolved by common proof").   In similar factual

26   circumstances, courts have rejected plaintiffs' arguments "that a common question capable of

27

28   ───────────────
     [7] Plaintiff described a "frock" as resembling a white doctor's coat. (*See* Plaintiff Dep. at 48:19–21.)

resolution through a common answer is available when a defendant's policy is facially legal." *Ordonez v. Radio Shack, Inc.*, No. CV 10–7060–CAS (JCGx), 2013 WL 210223, at *8 (C.D. Cal. Jan. 17, 2013); *see, e.g., id.* at *5 ("It is also unclear how a fact-finder could resolve this allegation without needing to conduct individual inquiries, since Plaintiff has not supplied any records, or analysis of any records, involving rest periods."); *Brinker*, 53 Cal. 4th at 1051 ("Nor has [plaintiff] presented substantial evidence of a systematic company policy to pressure or require employees to work off-the-clock, a distinction that differentiates this case from those he relies upon in which off-the-clock classes have been certified.").

Plaintiff's claims as to Defendants' policies regarding Covid health checks, cleaning lockers, and reading bulletin boards fare no better. From approximately March 2020 until January 2022, employees would undergo Covid temperature screenings upon entering the facilities. (Teeter Dep. at 68:16–69:14.) The temperature checks were conducted by infrared scan and did not take any extra time. (*Id.* at 69:12–14, 70:1–2.) If an employee had a temperature, the employee would be taken aside and assessed by the facility's occupational health staff. (*Id.* at 69:18–22.) Plaintiff stopped working for Cargill Meat in 2017, so she did not undergo any Covid screenings during her employment, and she provided no other evidence of other employees undergoing Covid checks.

In addition, there are lockers for employees to use at Cargill Meat's Fresno facility. (Doc. 77-3, Greving Decl., Ex. E, Declaration of Shelly McCurry ("McCurry Decl.") at ¶ 10.) There were not enough lockers for every employee at the facility, so Cargill Meat made lockers available to employees on a first come, first serve basis, and provided each person assigned a locker with a lock. (*Id.*; *see also* Teeter Dep. at 52:16–53:7, 60:25–61:2; Doc. 77-3, Greving Decl., Ex. G, Declaration of Octavio Rocha ("Rocha Decl.") at ¶ 10–12.) Employees could wear their steel toe boots home or keep them in their lockers if they had one. (McCurry Decl. at ¶ 9.) Locker use was optional, and there was no particular item that an employee was required to store in the locker; however, the locker could not be used to store food or any nonstandard PPE that could not be taken off of the production floor. (*Id.* at ¶ 12.) Locker rooms were cleaned during the weekends, usually on a monthly basis. (*Id.* at ¶ 13.) Employees were given verbal advance notice of when the locker room cleaning would occur and were asked to remove their belongings from their locker; they were

1   not required to clean the locker themselves.  (*Id.*)  If an employee did not remove their belongings

2   from a locker prior to the cleaning, the lock would be cut, the locker's contents would be placed in

3   a bag with the locker number, and the content could subsequently be retrieved by the employee.

4   (*Id.*)

5          Lastly, supervisory employees would provide all necessary information to hourly workers

6   orally, such as information regarding safety procedures, scheduling, and other updates.  (Rocha

7   Decl. at ¶ 14.)  This information was sometimes posted on the bulletin boards at the facility, often

8   near the time clocks or televisions in the breakroom.  (Doc. 77-3, Greving Decl., Ex. F, Declaration

9   of Froylan Rios, Jr. ("Rios Decl.") at ¶ 14; Rocha Decl. at ¶ 15.)  The bulletin board information

10  was intended to serve as a reminder to the employees in addition to the oral information provided

11  to them.  (Rocha Decl. at ¶ 15.)  No necessary information as posted solely on any bulletin board,

12  and no one was required to read the bulletin board to be able to perform their job.  (Rios Decl. at

13  ¶¶ 14–15; Rocha Decl. at ¶ 16.)

14         As with Defendants' policies regarding donning and doffing of standard PPE, the Court

15  finds that Defendants had facially valid policies as to Covid health checks, cleaning lockers, and

16  reading bulletin boards.  In other words, "the individualized assessment necessary to ascertain

17  whether there were in fact any employees who were told to work 'off-the-clock' would not be

18  susceptible to common proof."  *Ordonez*, 2013 WL 210223, at *9 (quoting *Washington v. Joe's

19  Crab Shack*, 271 F.R.D. 629, 642 (N.D. Cal. 2010)); *see also Cortez v. Best Buy Stores, LP*, No.

20  CV 11-05053 SJO (FFMx), 2012 WL 255345, at *9 (C.D. Cal. Jan. 25, 2012) (denying certification

21  where there was no evidence of a common policy of off-the-clock work); *In re: Autozone, Inc.

22  Wage and Hour Employment Practices Litig.*, No. 3:10-md-02159-CRB, 2016 WL 4208200, at *10

23  (N.D. Cal. Aug. 10, 2016) (internal quotation marks and citation omitted) (decertifying a class,

24  stating, "[t]t is doubtful that the Court would have certified the class in 2012 had it understood that

25  [the defendant] did not have a single uniform policy in place throughout the class period."); *Miles

26  v. Kirkland's Stores, Inc.*, 592 F. Supp. 3d 955, 968 (C.D. Cal. 2022) (denying certification of a

27  proposed class of employees who worked for the defendant from "May 24, 2014, through final

28  judgment" for lack of predominance in part because the allegedly unlawful policy "ha[d] not existed

1  since at least 2018"). This serves as a basis for the denial of class certification. *Hubbs*, 2017 WL

2  2304754, at *12.

3              *(b)     Plaintiff Has Not Shown that Defendants Have a Uniform,*
                        *Unlawful Off-the-Clock Practice*
4

5          Similarly, the Court finds that Plaintiff has failed to provide evidence that the practice of

6  donning and doffing standard PPE off-the-clock occurred on a ***class-wide basis***, and also fails to

7  offer evidence that it happened to ***her***. *See, e.g., Zayers*, 2017 WL 4990460, at *5.

8          Plaintiff testified that in all three roles, the only clothing she was required to wear during

9  her shift was a frock, steel toe shoes, a snowsuit,[8] a helmet, and gloves. (Plaintiff Dep. at 48:16–

10  21, 51:8–11, 79:9–17, 89:22–90:5.) She did not wear safety glasses because she wore her own

11  prescription glasses. (*Id*. at 44:7–18.) Plaintiff testified that she would clock in and obtain a frock,

12  gloves, a hairnet, and hearing protection, which she would put on before moving onto the

13  production floor. (*Id*. at 44:3–6, 48:22–49:11, 55:18–56:4, 59:7–15, 62:23–64:6.) When she came

14  off the floor for a meal or rest break, she would take off her frock and gloves, toss the frock into a

15  bin to be laundered, and clock out. (*Id*. at 49:12–19, 56:5–17, 101:3–14.) If her frock was not

16  dirty, Plaintiff would hang her original frock on a hook by her station. (*Id*. at 50:7–24.) When she

17  would go on a break, Plaintiff would sometimes trade out her hairnet. (*Id*. at 59:16–24.)

18  Specifically when Plaintiff went on meal breaks, the only equipment she would sometimes remove

19  from the time she clocked out to when she clocked back in was her helmet, which she would place

20  on the table in the breakroom. (*Id*. at 102:16–103:6.)

21          When she was finished with her break, Plaintiff would clock in, get new gloves, and a new

22  frock and hairnet if necessary, and return to the production floor. (Plaintiff Dep. at 50:17–20, 57:8–

23  17, 60:6–8, 101:9–14.) Plaintiff testified she was trained to take off her frock and gloves before

24  clocking out for breaks, and that at the end of the day, she would throw away her gloves, put her

25  frock into the bin, and then clock out. (*Id*. at 50:25–51:7, 57:18–20, 59:1–6.) Other production

26  employees underwent the same process at the end of their shifts to remove their PPE: they would

27  _____

28  [8] A "snowsuit" was essentially insulated overalls with no sleeves. (Plaintiff Dep. at 51:14–21; Teeter Dep. at 115:15–22.)

wash off their boots, if necessary; leave any nonstandard PPE at their workstation; keep on their hardhats, as those were always required near the production floor; drop off their frocks in the laundry bin; remove their gloves; throw away a hairnet or beard net; and then clock out.  (Teeter Dep. at 151:9–152:21.)

At some point during her employment, Plaintiff was assigned a locker.  (Plaintiff Dep. at 37:5–38:17.)  When Plaintiff came into work, she would change out of her regular shoes into her steel toe boots, snowsuit, and helmet, which she stored in her locker.  (*Id*. at 40:2–19.)  Before Plaintiff had a locker, she would wear her steel toe boots, snowsuit, hard hat home and then wear them again when she came back into work.  (*Id*. at 54:1–9, 55:9–13, 80:11–13, 108:23–109:1.)  Once she was assigned a locker, Plaintiff started leaving her boots and her hard hat there, but she was not required to do so, given that she still had the option of wearing both the boots and hard hat home.  (*Id*. at 54:15–22, 55:6–17.)  Plaintiff stated that after clocking out at the end of her shift, she would go to the locker room, take off her helmet, snowsuit, and steel toe boots, and change into her regular shoes.  (*Id*. at 107:15–108:22.)  Plaintiff did not use her locker for any other purpose.  (*Id*. at 40:20–21.) Plaintiff could not recall whether there were any bulletin boards with postings located in the breakroom, except for some postings of job bid opportunities.  (Plaintiff Dep. at 149:4–19.)  Plaintiff testified that she was not required to look at these job opportunities, but she would often look at them to see if they included any jobs in which she would be interested in applying.  (*Id*. at 149:20–150:6.)

Based on the evidence summarized above, Plaintiff offers insufficient evidence that any employment practices of off-the-clock donning and doffing of standard PPE, Covid health checks, cleaning of lockers, and reading of bulletin boards occurred on a standardized basis during the relevant time period.  Moreover, as set forth above, Plaintiff's theory of liability is belied by her own testimony. This shortcoming will necessarily lead to individualized inquiries about whether each employee was required to undergo work off-the-clock in order to determine Defendants' liability and is grounds for denial of certification.  *Hubbs*, 2017 WL 2304754, at *12; *see also Howard*, 2014 WL 11497793, at *10 ("When determining whether to certify a class, 'courts are comfortable with individualized inquires as to damages, but are decidedly less willing to certify

1    classes where individualized inquiries are necessary to determine liability.'") (citation omitted).

2    　　　Based on the foregoing, the Court finds that substantial evidence does not support a uniform

3    practice consistently requiring off-the-clock work applied throughout the class period. *See*

4    *Howard*, 2014 WL 11497793, at *10 (finding plaintiffs' evidence "appear[ed] to be poor 'glue'

5    holding together [their] claims," and left open questions that "invite[d] individualized inquiries.");

6    *see also Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 646 (N.D. Cal. 2008) ("it is apparent that plaintiff

7    has failed to identify any theory of liability that presents a common question."). Because a fact-

8    finder could not resolve Plaintiff's claims regarding off-the-clock work without engaging in a

9    myriad of individual inquiries, the undersigned finds Plaintiff has not established commonality, and

10   will recommend certification of Plaintiff's off-the-clock claims be denied. *See Rojas-Cifuentes*,

11   2018 WL 2264264, at *8.

12   　　　　　　　　　　　　　　*ii.*　　*Predominance*

13   　　　Even if Plaintiff had established commonality under Rule 23(a) as to her off-the-clock

14   claims, the Court finds that she has not demonstrated predominance under Rule 23(b)(3). As set

15   forth above, in addition to the four requirements under Rule 23(a), the Court must find that at least

16   one of the conditions under Rule 23(b)(3) is satisfied before certifying a class. "Implicit in the

17   satisfaction of the predominance test is the notion that the adjudication of common issues will help

18   achieve judicial economy." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

19   Given the Court's finding that Plaintiff's off-the-clock claims are not susceptible to common proof,

20   and in light of the "far more demanding" standard as to predominance, *In re ConAgra Foods, Inc.*,

21   90 F. Supp. 3d at 981, the Court finds that Plaintiff has not demonstrated predominance as to her

22   proposed class. *See Zayers*, 2017 WL 4990460, at *6 ("Predominance is not established where the

23   'fatal thread running through each of the [plaintiff's] claims is that liability will turn on

24   individualized facts.'") (citation omitted). Accordingly, for this additional reason, the undersigned

25   recommends certification of Plaintiff's off-the-clock claims be denied. *See Windsor*, 521 U.S. at

26   623.

27   　　　　　　　　　***c.***　　***Commonality and Predominance as to Plaintiff's Meal Period Claim***

28

16

1    In California, an employee who works more than five hours is entitled to an uninterrupted

2    30-minute meal period.  *See* Cal. Code Regs., tit. 8, § 11010(4); *id.*, § 11010(11); *Brinker*, 53 Cal.

3    4th at 1040 (holding that an employer "satisfies [its] obligation if it relieves its employees of all

4    duty, relinquishes control over their activities and permits them a reasonable opportunity to take an

5    uninterrupted 30-minute break, and does not impede or discourage them from doing so.").  Citing

6    two of the same theories of liability regarding off-the-clock work (e.g., donning and doffing

7    standard PPE and reading the bulletin boards), Plaintiff contends Defendants maintained common

8    practices or policies which did not relieve their employees of all duty during meal breaks.  (Doc.

9    72 at 28.)

10   The Court finds that Plaintiff's meal period claim faces the same barriers to certification as

11   the off-the-clock claims—namely, Defendants' meal period policy is facially neutral, and there was

12   no uniform practice to deprive employees of an uninterrupted 30-minute meal period.  Rather, the

13   evidence, including Plaintiff's own testimony, supports a finding that employees receive meal

14   periods in accordance with California law.

15                            *i.      Commonality*

16                            *(a)      Defendants' Meal Period Policy Is Facially Neutral*

17   Defendants' corporate designee testified that the procedure for clocking out for a meal break

18   is different than for clocking out at the end of a shift.  (Teeter Dep. at 81:4–6.)  Employees do not

19   sign equipment in and out, do not throw away their hairnet or beard net, and do not put their frocks

20   into bins to be laundered.  (*Id*. at 81:6–10.)  Hairnets are usually kept on the employees' hair under

21   their hard hat, and they usually leave their frocks at their workstation.  (*Id*. at 81:11–16.)  The same

22   procedure is used for clocking out for a rest break, except that different time clocks are used.  (*Id*.

23   at 82:9–18.)

24   Plaintiff testified that she routinely took meal breaks while she worked for Cargill Meat at

25   the Fresno facility.  (Plaintiff Dep. at 27:6–8.)  Under Cargill Meat's policy, employees could take

26   their first meal period after shifts that were less than six hours, and their second meal period for

27   shifts between ten and twelve hours.  (*Id*. at 31:22–32:5.)  They could forgo these meal periods by

28   signing waivers.  (*Id*. at 32:1–33:3.)  Employees would rotate in taking their rest and meal breaks,

1    so only one person took a break at a time.  (*Id*. at 72:20–74:21, 79:21–80:4, 81:12–25.)

2           As discussed above, Plaintiff testified she was trained to take off her frock and gloves before

3    clocking out for breaks, and that at the end of the day, she would throw away her gloves, put her

4    frock into the bin, and then clock out.  (Plaintiff Dep. at 50:25–51:7, 57:18–20, 59:1–6.)  There is

5    no evidence that Defendants had a policy requiring employees to read the bulletin board during

6    their meal breaks.  (Rios Decl. at ¶¶ 14–15; Rocha Decl. at ¶ 16.)

7           As with Plaintiff's off-the-clock claims, the evidence shows that Defendants' meal period

8    policy is facially compliant with California law.  Each class member's recovery, therefore, depends

9    on factual questions particular to that individual's inability to take a complete meal period.  *Zayers*,

10   2017 WL 4990460, at *6.  Because individualized assessments are required to ascertain whether

11   there were any employees who were deprived of meal breaks free of employer control, the Court

12   finds that Plaintiff's meal break claim is not susceptible to common proof.  *See Ordonez*, 2013 WL

13   210223, at *8; *Christensen*, 2021 WL 4932244, at *11 (citing *In re AutoZone, Inc., Wage & Hour*

14   *Emp. Pracs. Litig.*, 789 F. App'x 9, 11 (9th Cir. 2019)).  This is grounds for denial of class

15   certification.  *Hubbs*, 2017 WL 2304754, at *12; *Howard*, 2014 WL 11497793, at *10.

16                    *(b)      Plaintiff Has Not Shown that Defendants Have a Uniform,*
                              *Unlawful Meal Period Practice*
17

18          Likewise, the Court finds that Plaintiff has failed to provide evidence that there was an

19   unlawful meal period practice that occurred on a class-wide basis.  To the contrary, her assertion

20   on this basis is undermined by her own testimony.

21          As discussed above, Plaintiff testified that when she came off the floor for a meal break,

22   she would take off her frock and gloves, toss the frock into a bin to be laundered if it was dirty, and

23   clock out.  (Plaintiff Dep. at 49:12–19, 56:5–17, 101:3–14.)  If Plaintiff's frock was not dirty, she

24   would only don or doff her frock while she was on the production floor, still clocked in, by leaving

25   it on a hook by her station.  (*Id*. at 50:7–24.)  During her meal breaks, the only equipment Plaintiff

26   would sometimes remove while clocked out was her helmet, which she would just place on the

27   table in the breakroom.  (*Id*. at 102:16–103:6.)  When she was finished with her break, Plaintiff

28

                                                       18

would clock in, obtain new gloves, as well as a new frock and hairnet if necessary, and go back onto the production floor.  (*Id*. at 50:17–20, 57:8–17, 60:6–8, 101:9–14.)

Plaintiff could not recall any shifts in which she worked between ten to twelve hours and wanted to take a meal break, but was told that she could not take one.  (Plaintiff Dep. at 33:21–25.) Plaintiff also testified that she always took her 30-minute meal breaks.  (*Id*. at 103:14–25.)  In her role as a forklift driver, she never stayed for more than a few minutes onto a second eight-hour shift.  (*Id*. at 107:1–11.)

In light of the foregoing, the Court finds that there is no substantial evidence that Defendants had a practice that uniformly deprived employees in the Fresno facility of a lawful meal period. *See Howard*, 2014 WL 11497793, at *10.  As a result, the Court would have to conduct individualized inquiries determine Defendants' liability.  Accordingly, the undersigned will recommend that certification of Plaintiff's meal period claim be denied for lack of commonality. *See Rojas-Cifuentes*, 2018 WL 2264264, at *8.

### ii.   Predominance

As with her off-the-clock claims, even if Plaintiff had established commonality under Rule 23(a) as to her meal period claim, the Court finds that Plaintiff cannot show predominance under Rule 23(b)(3).  As described above, the Court finds Plaintiff's meal period claim does not present common issues, and therefore, the "there is a risk that substantial individualized inquiries will be necessary to determine liability." *Hubbs*, 2017 WL 2304754, at *12; *Valentino*, 97 F.3d at 1234. For the same reasons, the Court further finds that Plaintiff fails to meet the "far more demanding" standard for predominance of her meal period claim as to her proposed class.  *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 981; *Zayers*, 2017 WL 4990460, at *6.  Accordingly, the undersigned recommends certification of Plaintiff's meal period claim be denied.  *See Windsor*, 521 U.S. at 623.

### d.   Commonality and Predominance as to Plaintiff's Reimbursement Claim

"[An] employer is required to reimburse employees only for 'necessary expenses,' Cal. Lab. Code § 2802(a), which does not include an employee's basic work clothing that is 'usual and generally usable in the occupation.'" *Hernandez*, 2023 WL 3069760, at *14 (citing *Carlos v. Wal-Mart Assoc., Inc.*, No. 5:21-CV-00294-AB (KKx), 2022 WL 2784768, at *5 (C.D. Cal. May 3,

2022)); *see, e.g., Townley v. BJ's Restaurants, Inc*., 37 Cal. App. 5th 179, 185 (2019) (employer requiring "slip resistant shoes" did not have to reimburse employees because slip resistant shoes are "basic wardrobe items which are usual and generally usable in the occupation"). "And, '[t]he employer is not required to pay for non-specialty safety-toe protective footwear (including steel-toe shoes or steel-toe boots).'" *Hernandez*, 2023 WL 3069760, at *14 (quoting 29 C.F.R. § 1910.132(h)(2)). Plaintiff asserts that Defendants have a facially illegal policy and practice of deducting from Plaintiff's and other employees' paychecks expenses for supplies that were necessary to comply with Defendants' safety and sanitary conditions, such as steel toe boots and snowsuits. (Doc. 72 at 22–27.)

          *i.*     *Commonality*

          *(a)*     *Defendants' Reimbursement Policy Is Facially Neutral*

Upon hire, employees at Cargill Meat were provided with a pair of the steel toe boots at no cost to them. (Rocha Decl. at ¶ 7.) Some employees elected to continue using these boots. (*Id*.) Employees were also given the option of using a $100 voucher to purchase steel toe boots at Cargill Meat's store. (Plaintiff Dep. at 118:8–18.) If employees chose to spend more than the voucher, they had to cover the difference via an authorized payroll deduction. (Greving Decl., Ex. I, Declaration of Garbriela Diaz Zepeda ("Zepeda Decl.") at ¶ 8.) The boots had to go above the ankle and had to be slip and water resistant. (Plaintiff Dep. at 118:12–119:2.) Plaintiff could not recall whether there were shoes that cost $100 or less when she went to the store. (*Id*. at 119:3–5.) Other employees stated that there were policy-compliant boots available for under $100, so employees did not necessarily need to pay out-of-pocket for compliant footwear if they chose to use the voucher. (*See, e.g*., Zepeda Decl. at ¶ 8.)

As discussed above, Plaintiff testified that in all three of her roles, the only clothing she was required to wear during her shift was a frock, steel toe shoes, a snowsuit, a helmet, and gloves. (Plaintiff Dep. at 48:16–21, 51:8–11, 79:9–17, 89:22–90:5.) She stated she paid for the snowsuit she wore, which Cargill Meat ordered for her. (*Id*. at 52:2–3.) The money for the snowsuit was deducted from her paycheck, and she could not recall how much it cost. (*Id*. at 119:6–16.) Plaintiff stated she was not required to wear this snowsuit, but she preferred not wearing something she

already owned because this particular snowsuit kept her warmer while she worked on the production floor.  (*Id.* at 52:4–53:2.)  The production floor was often kept around 40 degrees Fahrenheit or less, and it was even colder in the freezers.  (McCurry Decl. at ¶¶ 8–9.)  Other employees chose to wear other snowsuits or warm weather equipment instead of the one Plaintiff had ordered.  (Plaintiff Dep. at 53:3–14.)

As with Plaintiff's other claims, the evidence shows that Defendants' reimbursement policy is facially compliant with California law.  Each class member's recovery, therefore, depends on factual questions particular to Defendants' failure to reimburse their employees for a necessary expense.  *Zayers*, 2017 WL 4990460, at *6.  Because individualized assessments are required to ascertain whether there were in fact any employees who were not properly reimbursed for necessary expenses, the Court finds that Plaintiff's reimbursement claim is not susceptible to common proof.  *See Ordonez*, 2013 WL 210223, at *8; *Christensen*, 2021 WL 4932244, at *11.  This is grounds for denial of class certification.  *Hubbs*, 2017 WL 2304754, at *12; *Howard*, 2014 WL 11497793, at *10.

          *(b)      Plaintiff Has Not Shown that Defendants Have a Uniform, Unlawful Reimbursement Practice*

For the same reasons, the foregoing evidence also fails to show that Defendants had a practice of refusing to reimburse employees for necessary items.  *See, e.g., Hernandez*, 2023 WL 3069760, at *14 (coming to the same conclusion where defendant supplied hard hats and safety vests, but some employees did not wear them and preferred to use their own items, and plaintiffs' own evidence confirmed defendant provided hard hats and vests).  In light of Defendants' facially complaint reimbursement policies, and the lack of any indication that Defendants uniformly refused to reimburse employees for necessary expenses outside of basic work clothing, the Court finds that Plaintiff fails to show commonality as to her reimbursement claim.  To conclude otherwise would require the Court to undergo individualized inquires, which it declines to do.  Accordingly, the undersigned will recommend that certification of Plaintiff's reimbursement claim be denied.

          *ii.      Predominance*

1    Similar to her other claims, even if Plaintiff had established commonality under Rule 23(a)

2  as to her reimbursement claim, she cannot show predominance under Rule 23(b)(3).  As set forth

3  above, the Court finds that Plaintiff's reimbursement claim does not present common issues, and

4  therefore, the "there is a risk that substantial individualized inquiries will be necessary to determine

5  liability."  *Hubbs*, 2017 WL 2304754, at *12; *Valentino*, 97 F.3d at 1234.  For the same reasons,

6  the Court finds that Plaintiff fails to meet the "far more demanding" standard for predominance of

7  her reimbursement claim as to her proposed class.  *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d

8  at 981; *Zayers*, 2017 WL 4990460, at *6.  Accordingly, the undersigned recommends certification

9  of Plaintiff's reimbursement claim be denied.  *See Windsor*, 521 U.S. at 623.

10                    *e.     Plaintiff's Derivative Claims*

11    Finally, Plaintiff seeks to certify wage statement and waiting time penalty claims that are

12  derivative of her off-the-clock claims.  (Doc. 72 at 28–29.)  As discussed above, the Court finds

13  that Defendants' off-the-clock policy is facially neutral and that Plaintiff failed to provide

14  substantial evidence that employees were subject to a uniform unlawful practice to perform work

15  off-the-clock, and as such, commonality and predominance are not satisfied.  To the extent that the

16  derivative claims rest on Defendants' allegedly unlawful off-the-clock practices and are derivative

17  of the claims addressed above, they also do not meet the commonality and predominance

18  requirements.  *See, e.g.*, *Collins v. ITT Educ. Servs., Inc.*, No. 12-cv-1395, 2013 WL 6925827, at

19  *10 (S.D. Cal. July 30, 2013) (denying certification of wage statement class because it was

20  "derivative" of the other claims); *Gonzalez v. Officemax N. Am.*, Nos. 07-cv-00452, 07-cv-04839,

21  2012 WL 5473764, at *6 n.13 (C.D. Cal. Nov. 5, 2012) (same); *Miles*, 592 F. Supp. 3d at 967–68

22  (same).  Accordingly, the undersigned will recommend that certification of Plaintiff's derivative

23  claims be denied.

24            **III.       CONCLUSION AND RECOMMENDATIONS**

25    Based on the foregoing, the undersigned concludes that Plaintiff lacks commonality and

26  adequacy pursuant to Fed. R. Civ. P. 23 with respect to the putative class members proposed in the

27  Class Certification Motion.  Accordingly, the undersigned RECOMMENDS that:

28        1.     The parties' requests to seal (Docs. 73, 79) be DENIED as moot; and

1        2.      Plaintiff's Motion for Class Certification (Doc. 72) be DENIED.

2        These Findings and Recommendation will be submitted to the United States District Judge

3 assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l)(B).  Within **fourteen**

4 **(14) days** after being served with these Findings and Recommendations, the parties may file written

5 objections with the Court.  E.D. Cal. Local Rule 304(b).  The document should be captioned

6 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

7 failure to file objections within the specified time may result in the waiver of rights on appeal.

8 *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d

9 1391, 1394 (9th Cir. 1991)).

10

11 IT IS SO ORDERED.

12 Dated:   **October 10, 2023**                    */s/ Sheila K. Oberto*

13                                                    UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28